UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| VIKTOR KHALIMSKY ET AL. | CIVIL ACTION |
| VERSUS | NO. 07-8959 |
| LIBERTY MUTUAL FIRE INSURANCE COMPANY | SECTION "N" (5) |

# **O R D E R and R E A S O N S**

Before the Court are three Motions for Reconsideration, arising from various determinations reached by the Court in its Order of April 13, 2009 (Rec. Doc. 95) (hereinafter "April 13th Order").[1] The motions under consideration in this Order are as follows:

(1) Defendant's Motion for Reconsideration on Mental Anguish Damages (Rec. Doc. 107);

(2) Plaintiffs' Motion for Reconsideration on Loss of Use and Damage Caused in Part by Flood (Rec. Doc. 113);

(3) Plaintiffs' Motion for Reconsideration on Medical Expenses and Lost Wages (Rec. Doc. 114).

Each motion is opposed. After considering the April 13th Order, the memoranda of the parties, and the applicable law, the Court rules as set forth herein.

---

[1] The Court issued two Orders, one on April 9, 2009 (Rec. Doc. 94) and one on April 13, 2009 (Rec. Doc. 95). The two Orders were identical except that the latter Order corrected a clerical error on page 21 of the original Order.

## I. BACKGROUND

The factual background of this case was described at length in the April 13th Order, so the Court will move directly to its analysis.

## I. ANALYSIS

### A. Legal Standard

A district court has considerable discretion to grant or deny a motion for reconsideration. *See Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 355 (5th Cir. 1993). A Rule 59(e) motion "serve[s] the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." *Mendler v. Derouen*, 2009 WL 411244, at *1 (E.D. La. 2009) (Vance, C.J.). The Court must "strike the proper balance" between the need for finality and "the need to render just decisions on the basis of all the facts." *Edward H. Bohlin Co.*, 6 F.3d at 355. To succeed on a motion for reconsideration, a party must "'clearly establish either a manifest error of law or fact or must present newly discovered evidence.'" *Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir. 2005) (quoting *Pioneer Natural Res. USA, Inc. v. Paper, Allied Indus., Chem. & Energy Workers Int'l Union Local 4-487*, 328 F.3d 818, 820 (5th Cir. 2003)). A Rule 59(e) motion is an extraordinary remedy and is seldom granted. *Templet v. HydroChem, Inc.*, 367 F.3d 473, 479 (5th Cir. 2004). Such a motion "is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised prior to the entry of judgment." *Id.* The Fifth Circuit has "held that an unexcused failure to present evidence available at the time of summary judgment provides a valid basis for denying a subsequent motion for reconsideration." *Id.* (*citing Russ v. Int'l Paper Co.*, 943 F.2d 589, 593 (5th Cir. 1991)).

**B. Defendant's Motion on Mental Anguish Damages**

In the April 13th Order, the Court relied heavily upon an affidavit from Khalimsky describing a "series of tense and increasingly argumentative conversations with representatives of Liberty Mutual regarding his policy and Murray's adjustment," *see* April 13th Order at *14-15, in denying Defendant's motion for partial summary judgment as to mental anguish damages. As the Court noted, citing this affidavit, "From November 17th to November 19th of 2005, Khalimsky had seven different phone conversations with representatives of Liberty Mutual, which became increasingly contentious and argumentative. Within hours of the last call, he suffered the chest pains that caused him to seek medical attention. These phone calls and the chest pains are competent circumstantial evidence of mental anguish." *Id.* at *19 (citations omitted). Mr. Khalimsky has since withdrawn this affidavit, and on these grounds Liberty Mutual asks the Court to reconsider the April 13th Order to this extent.

Obviously, the withdrawal of this affidavit makes the question of whether there is a genuine material fact issue as to mental anguish damages a much closer one. However, the Court still concludes that there is competent evidence in the record from which a reasonable factfinder could find that Liberty Mutual's adjustment of Plaintiffs' claim was in bad faith, and that this bad faith adjustment caused Khalimsky compensable mental anguish. Chief among these pieces of evidence is the testimony of Ann Parnes and Faina Lushtak as to changes in Khalimsky's personality after Katrina and the way in which Khalimsky's stress over his dealings with Liberty Mutual infiltrated the household. *See Dickerson v. Lexington Ins. Co.*, 556 F.3d 290, 306 (5th Cir. 2009) (mental anguish damages supported by "daughter's testimony of watching her father's mental state deteriorate and his becoming short-tempered and anti-social"). This testimony has

not been withdrawn and is competent evidence from which a jury could conclude that Khalimsky suffered mental anguish. Khalimsky has also replaced the withdrawn affidavit with another that testifies as to making "numerous" calls to Liberty Mutual in October and November of 2005, though he does not remember the precise dates of these calls. *See* Opp. at Ex. A (Khalimsky affidavit) (Rec. Doc. 121). This evidence is buttressed by testimony in the record that he may have made calls from phones other than his cell phone, including a free call center AT&T set up for hurricane victims in 2005. *See* Mot. at Ex. G (Khalimsky deposition, pp. 20-21) (Rec. Doc. 107). The most important piece of evidence, however, is Mr. Khalimsky's chest pains, which a reasonable jury could conclude were caused in whole or part by Khalimsky's stress and mental anguish attendant upon the purported arbitrary and capricious handling of his claim. *See Dickerson*, 556 F.3d at 306 (physical manifestations of mental anguish and stress are admissible evidence in support of mental anguish damages). The Court acknowledges that Khalimsky's claim for mental anguish damages is substantially impaired by the withdrawal of his earlier affidavit. But enough evidence remains to create a genuine material fact issue, albeit a close one, and accordingly the motion is denied.[2]

---

[2] Defendant argues that because the Plaintiffs did not discover the alleged damage to their attic (which is the basis of their bad faith claim) until several years after Khalimsky's 2005 medical crisis, the bad faith adjustment cannot be the cause of Khalimsky's mental anguish. There is testimony from Ann Parnes suggesting that Khalimsky was angered by the failure of Liberty Mutual's adjustor to inspect the attic. Liberty Mutual argues that this testimony is hearsay and thus not competent to raise a genuine material fact issue. The Court need not rule on that point, however, since there is evidence to suggest that Khalimsky himself knew that the attic had gone uninspected in 2005 and had concerns about damage to the roof and attic. This evidence includes an email he sent to Charles Murray on October 20, 2005, noting water damage to the second-floor ceiling, the full extent of which might have been noticed if Mr. Murray had inspected the attic. The larger point is not whether Khalimsky knew about the damage to his attic, but whether the allegedly bad faith adjustment of his claim, including the failure to inspect the attic, caused him mental anguish. Liberty Mutual may well be able to show that whatever

4

**C. Plaintiffs' Motion on Loss of Use and Damage Caused in Part by Flood**

Plaintiff argues that the Court committed legal error in granting summary judgment denying Plaintiffs' claim for loss of use, or "additional living expenses" (ALE), since it did not consider a spreadsheet of Plaintiffs' expenses prepared by Plaintiffs (and supposedly sworn to in Faina Lushtak's deposition) but offered by Defendant as part of its own motion on this issue. Additionally, Plaintiffs argue that they have new evidence of additional living expenses in the form of receipts offered for the first time on the motion to reconsider.

The Court rejects Plaintiffs' arguments. While it is true that Liberty Mutual attached the spreadsheet to one of its summary judgment motions, this was for the limited purpose of showing that Plaintiffs were claiming a certain amount for ALE. *See* Mot. at 4 (Rec. Doc. 33). Liberty Mutual certainly did not argue that this spreadsheet adequately documented Plaintiffs' ALE claim; in fact, it argued the exact opposite, and at length. *Id.* at 4-6. The fact remains that the spreadsheet is an unsworn document that is incompetent to raise a genuine material fact issue.

Additionally, the Court rejects Plaintiffs' argument that the spreadsheet was, in fact, sworn to in Faina Lushtak's deposition testimony. Plaintiffs point to several lines of testimony in the deposition:

> Q. And this Additional Living Expenses spreadsheet, Exhibit E, does it include all the expenses you're aware of?
> A. This moving expenses? Probably so. I cannot come out with anything right now.

---

mental anguish Khalimsky suffered was caused by other stresses and concerns that are not compensable—such as, for example, Khalimsky's claim for additional living expenses, on which the Court has granted Defendant summary judgment. But Liberty Mutual has not made that showing as a matter of law.

5

*See* Mot. at Ex. B (Lushtak deposition, p. 96, ll. 8-13) (Rec. Doc. 33). Several lines later, counsel attaches the spreadsheet to the deposition. *Id.* (ll. 17-19). This weak affirmation that the spreadsheet lists all the ALE expenses Lushtak is aware of does not serve to transform it into a sworn declaration or affidavit such that it is competent summary judgment evidence.[3]

Nor does the Court consider, on this motion, the receipts submitted by Plaintiffs on the motion to reconsider. These receipts were in Plaintiffs' custody at the time they filed their opposition to the motion for summary judgment on this issue. Plaintiffs have made no showing that there was any good reason these receipts were not brought forward to oppose the summary judgment motion.[4] *See Templet*, 367 F.3d at 479. The Court distinguishes the case of *Ford v.*

---

[3] Additionally, the Court notes that while this snippet of deposition testimony was among the more than 80 pages of deposition testimony attached to the original motion and opposition, neither party highlighted those particular five lines. Although the Court is to consider the full record in ruling on a motion for summary judgment, Rule 56 does not obligate it to search for evidence to support a party's opposition to summary judgment. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) ("When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."). Thus, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims. *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994).

[4] Plaintiffs argue that their "ability to prosecute their claim has been hampered by the mental condition/cognitive abilities of Mr. Khalimsky." Mot. at 9. The Court is aware of these difficulties, and has been and will be mindful of them in granting appropriate leeway to Plaintiffs to make their case. These difficulties have little or nothing to do with the failure to attach these receipts to the opposition to the motion for summary judgment, however—especially since this case is now more than 18 months old and this is hardly evidence the importance of which could be a surprise to counsel. If these receipts could be gathered in the two weeks between the Court ruling on the summary judgment motion and the filing of the instant motion, they could have been found sometime in the past 18 months.

Additionally, even if the Court were to consider these receipts, they would not change the outcome, since Plaintiffs have not shown (1) that the receipts total more than $4,000, (2) were incurred within a year after loss as required by the policy, and (3) were for expenses beyond the norm for their standard of living. *See Republic Fire & Cas. Ins. Co.*, 2008 WL 4792720, at *3

*Elsbury*, 32 F.3d 931, 937 (5th Cir. 1994), that Plaintiffs rely upon on grounds that *Ford* is limited to specific facts involving the grant of a motion for summary judgment *sua sponte*, where Plaintiffs were not on notice of the need to make an evidentiary showing. Those facts are not applicable here and the Court will not consider evidence that was available to oppose the summary judgment motion. To this extent, the motion is accordingly denied.

On the Court's grant of summary judgment as to the anti-concurrent cause clause in Plaintiffs' policy, Plaintiffs argue that "[r]ecent jurisprudence from the U.S. Fifth Circuit acknowledges a divergence in interpretation of exclusionary clauses between the Fifth Circuit and the Louisiana appellate courts." Mot. at 12. Be that as it may, Plaintiffs also acknowledge that the Circuit considered itself bound by its own precedent strictly construing such clauses. Obviously, if the Circuit considers itself bound on this issue, this Court is as well, and accordingly in this respect the motion is denied.

**D. Plaintiffs' Motion on Medical Expenses and Lost Wages**

Plaintiffs argue that the Court committed legal error in applying "the duty-risk analysis in determining whether the plaintiff's stroke (and resulting lost income and medical expenses) should be compensable under Section 22:1220" since

> nowhere in the statute or in *Dickerson* is there any mention of the duty-risk test as the appropriate method for analyzing damage claims under 22:1220. The plaintiffs suggest that a negligence standard is inappropriate where, as *Dickerson* explains, a breach under La. R.S. 22:1220 is more than a mere breach of contract–it is a breach of the distinct duty of good faith.

---

(E.D. La. 2008) (to prevail on ALE claim, plaintiff must "show his normal, baseline costs, and then expenses *beyond that baseline*") (emphasis in original)). Additionally, the Court notes that several of the receipts are in the name of persons other than Mr. Khalimsky or Ms. Lushtak, and thus it is questionable whether they would raise a genuine material fact issue absent other evidence showing that they were for expenses incurred by Plaintiffs.

Mot. at *8-9.[5] Rather, Plaintiffs argue, the appropriate standard is supplied by Article 1997 of the Civil Code, which holds that "[a]n obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform." LA. CIV. CODE art. 1997. As such, Plaintiff argues, the Court's determination that Mr. Khalimsky's stroke was not a harm within the risk of a bad-faith breach was legal error, since such analysis is inapplicable under § 22:1220.

The Court disagrees with Plaintiffs' contention that damages under § 22:1220 are governed by the "direct consequence" standard of Article 1997. As a starting matter, a claim under Article 1997 is a claim for a bad faith breach of contract, and has always been limited to the recovery of pecuniary damages. This principle suggests that a statute such as 22:1220 that allows recovery of non-pecuniary damages must not employ Article 1997's "direct consequences" standard. The Louisiana Second Circuit extensively recounted the damages available under Article 1997 in *Nolan v. Commonwealth National Life Insurance Company*, as part of its discussion of codal changes to the old Article 1934 that resulted in the present Articles 1997 and 1998:

> Nonpecuniary damages, which had as their source Article 1934(3), are damages for mental anguish, inconvenience, humiliation and embarrassment. These damages certainly would appear to have relevance to a bad faith breach particularly since, as explained by the drafters of new Article 1998, nonpecuniary loss in civilian doctrine is "damage of a moral nature which does not affect a 'material' or tangible part of a person's patrimony." Nevertheless, the remediation of moral damages does not appear to be the focus of Article 1997 . . . .
> As to the possibility of an award of nonpecuniary damages for a bad

---

[5] Effective January 1, 2009, LA. REV. STAT. ANN. § 22:1220 was renumbered § 22:1973. By the same act, LA. REV. STAT. ANN. § 22:658 was renumbered § 22:1892. *See* Acts 2008, No. 415, § 1. For ease of reference and to conform to the Complaint, the Court will cite to §§ 22:1220 and 22:658.

> faith breach under the prior code provisions, former paragraphs (2) and (3) of Article 1934 set forth successively the measure of bad faith damages and nonpecuniary damages. Although a bad faith breach allowed for the possibility of an award for unforeseen damages, those damages nevertheless appeared limited to the indemnification of the immediate and direct pecuniary consequences of the breach leaving no room for the discretion of the trier of fact to impose nonpecuniary damages. . . . .
>
> Consequently, there appears to be no case indicating that the unforeseeable damages allowable under former Article 1934(2) for a bad faith breach included unforeseen, nonpecuniary loss or prejudice sustained by the obligee. Article 1997, which has taken the place of Article 1934(2), does not reflect a change in the law.

*Nolan v. Commonwealth Nat. Life Ins. Co.*, 688 So.2d 581, 584-85 (La. App. 1996), *writ denied*, 692 So.2d 449 (La. 1997).

Further, as the Plaintiffs themselves argue, the duties imposed by § 22:1220 are not merely contractual duties, but a *separate* "affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims." LA. REV. STAT. § 22:1220. The "breach" referred to in the second sentence of 22:1220 is not a breach of the underlying contract, but a breach of these separate, affirmative statutory duties to adjust fairly and promptly and make reasonable efforts to settle claims.[6] This is the construction of the statute employed by the Fifth

---

[6] Even were the Court to conclude that damages in the instant case are governed by Article 1997, it is simply not the case that a bad faith obligor is responsible for all damages flowing from his bad faith breach of contract, no matter how remote they may be. "When other factors besides an obligor's failure to perform intervene in compounding the cause of a damage, recovery is not warranted because that damage is then regarded as an indirect consequence of the obligor's failure." 6 LA. CIV. L. TREATISE § 5.27. Such damages "are those that are caused not solely by the obligor's fault, but also by other factors that intervene in the chain of causality." *Id.* at § 5.26. While the distinction between direct and indirect consequences on the one hand and foreseeable and unforeseeable damages on the other is occasionally imprecise, it does serve "to introduce moderation and reasonableness into the drawing of a line at which the liability of an obligor, even one in bad faith, ceases." *Id; see also id.* at § 16.7 ("Concerning foreseeable, as opposed to unforeseeable, damages . . . the foreseeability of the resulting damage has operated as a limitation to the liability for both tort and breach of contract . . .").

Circuit in *Dickerson*, which found that § 22:1220 "addresses a harm distinct from breach of contract . . . . The statute specifically refers to a breach of the duty of good faith; it does not refer to breach of contract." *Dickerson*, 556 F.3d at 304.[7]

The Court also rejects Plaintiffs' argument that language in *Dickerson* that suggests that § 22:1220 is "broadly worded" is meant to subject defendants to liability for any consequence of breach, no matter how remote. *See Dickerson*, 556 F.3d at 303-04. The issue before the Fifth Circuit was whether nonpecuniary damages were available under § 22:1220. The Circuit concluded that such damages were available because the statute was broadly worded so as not to preclude all types of damages *available in other tort claims*. But there is nothing in *Dickerson* that suggests that the Fifth Circuit meant that damages pursuant to § 22:1220 are not limited by the foreseeability of the injury to Plaintiff.

Nonetheless, the Court acknowledges that Plaintiff's argument is not without force, since § 22:1220 arguably creates an intentional tort to which duty-risk analysis may not be entirely appropriate. In Section B of the statute, the legislature describes six acts that breach the duty of good faith "if *knowingly* committed or performed by an insurer . . . ." LA. REV. STAT. ANN. § 22:1220(B) (emphasis added). The acts described include such intentional acts as misrepresentation, denying a claim based on an application the insurer knows has been altered

---

[7] This language in *Dickerson* is perhaps somewhat overbroad, since taken at face value it might tend to suggest that the Fifth Circuit was overruling longstanding precedent that makes statutory fees and penalties under §22:1220 and its companion statute unavailable absent failure to pay an legitimate underlying claim. *See, e.g.*, *Clausen v. Fidelity and Deposit* Co., 660 So.2d 83 (La. App.1995), *writ denied*, 666 So.2d 320 (La. 1986). In this sense, breach of the duty to adjust fairly is not "a harm distinct from breach of contract"; rather, the duty of good faith is interrelated with the duties created by the contract, since the statute essentially imposes a duty on the insurer to perform its contractual obligations in good faith. The Court does not read *Dickerson* as contradicting *Clausen* or like cases.

without the knowledge and consent of the insured, or misleading an insured as to the prescriptive period. *Id.* This interpretation of the statute also comports with longstanding precedent holding that an insurer is only liable for vexatious refusal to pay without good reason—for conduct, that is, that goes beyond the merely negligent. *See, e.g.*, *Reed v. State Farm Mut. Auto. Ins. Co.*, 857 So.2d 1012, 1021 (La. 2003); *Block v. St. Paul Fire & Marine Ins. Co.*, 742 So.2d 746, 752 (La. App. 1999); *Holt v. Aetna Cas. & Sur. Co.*, 680 So.2d 117, 130 (La. App. 1996).

Nonetheless, the Court concludes that damages under § 22:1220 are constrained by the foreseeability of the plaintiff's injury.[8] Even assuming that a breach of § 22:1220 is an intentional tort—a debatable proposition[9]—and accepting that an "intentional tortfeasor is more likely to be held liable for consequences that are more remote, even unforeseeable, than would be compensable in a negligence action," *see* 12 LA. CIV. L. TREATISE § 12.5, the Court nonetheless rejects the proposition that foreseeability has *no* place in the analysis of damages under § 22:1220. *See* Prosser and Keeton, TORTS, at 263 (5th ed. 1984) (noting that in a

---

[8] In the April 13th Order, the Court used the terms "foreseeability" and "proximate cause" interchangeably. Technically, the foreseeability element of the duty-risk analysis employed in Louisiana courts differs from the proximate cause analysis used in other courts in that it is a question of policy for the Court and not for the jury. *See* 12 LA. CIV. L. TREATISE § 1.16. The analysis is similar, though, in that the question to be answered is whether the harm to the plaintiff was foreseeable to the defendant. As one oft-cited article put the matter, "The more difficult part of the duty question is the further and bifurcated inquiry as to whether the enunciated rule or principle of law extends to or is intended to protect this plaintiff from this type of harm arising in this manner." William L. Crowe, Sr., *The Anatomy of a Tort—Greenian, as Interpreted by Crowe who has been Influenced by Malone—A Primer*, 44 LOY. L. REV. 647, 650 (1999).

[9] For example, while it is clear that conduct that creates liability under the statute must be "vexatious," *see supra*, that does not mean that the conduct rises to the level of intentionality. *See* Prosser and Keeton, TORTS, at 36 (5th ed. 1984) (discussing difference, in terms of foreseeability, of conduct that is "reckless or wanton" and "intentional").

11

negligence action "or for that matter *for any other tort* [there must] be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered") (emphasis added). This is especially true as regards a statute that is penal in nature and must be strictly construed, since it makes a defendant liable not just for general damages but also substantial penalties in addition. *See Theriot v. Midland Risk Ins. Co.*, 694 So. 2d 184, 186 (La. 1997); *see also* LA. REV. STAT. ANN. § 22:1220(C) ("In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater."). If the Court were to accept the construction of this statute urged upon it by Plaintiffs, insurers in Louisiana could be liable not just for foreseeable but also unforeseeable economic damages, *and* foreseeable and unforeseeable non-economic damages, *and* a penalty equivalent to 200 percent of all damages. Such a construction could make insurers liable for many, many multiples of the damages that could be recovered even for a bad faith breach of contract. The Court declines to ascribe to the legislature the intent to depart so radically from the structure of Louisiana tort law in this instance, absent more compelling evidence than that presently before it.

    Finally, the Court has been presented with no new evidence that convinces it that it committed error in determining that, applying a duty-risk analysis, Mr. Khalimsky's stroke was not a foreseeable harm within the risk of bad-faith claims handling. Another federal district judge in this state (sitting in the Eastern District because a magistrate in this district was called as a fact witness) has similarly applied duty-risk analysis to conclude that a catastrophic physical injury is not foreseeable to a defendant who might have breached § 22:1220, albeit in a case

arising under slightly different circumstances. In *Arceneaux v. State Farm Fire & Cas. Co*, 2009 WL 959948 (E.D. La. April 7, 2009), an insured who had a pending action under the companion statute to § 22:1220 died of a heart attack just after filing suit. Her children then filed a wrongful death action against the insurance company, claiming that the insurer's bad faith claims handling practices substantially contributed to the death. In finding that the children had no claim under the wrongful death statute, the district court concluded that § 22:1220 did not create duties "independent and separate" from the contractual duties created by the policy. In light of the Court's discussion of the separate, affirmative statutory duties created by § 22:1220, *see supra* at 9-10, the Court obviously disagrees with this finding to the extent it is incompatible with the Court's instant Order. However, the *Arceneaux* court further reasoned that even if it were not correct in so concluding, the wrongful death action could not be maintained, since—applying duty-risk analysis and focusing on foreseeability—the insurer was not "at fault" for the insured's heart attack. The *Arceneaux* court noted that § 22:1220 appears in the "Unfair Trade Practices" portion of the Insurance Code and that the insurer's "statutory duty of good faith and fair dealing was to protect [plaintiff] from the economic consequences of the improper handling of her insurance claims, not to protect her emotional or physical well-being." *Id.* at *5. Accordingly, the district court concluded, "The risk that an insured might become so mentally stressed that she suffers a heart attack is simply not within the scope of an insurer's duty to handle claims in good faith. Such a risk cannot reasonably be foreseen or anticipated, nor can the risk of such injury and the legal duty be easily associated." *Id.* The Court finds this reasoning persuasive and accordingly declines to alter the April 13th Order in this respect.

However, as noted above, the issue is a difficult and close one, and the Court has had to

reason without the guidance of the Fifth Circuit, the Louisiana Supreme Court, lower Louisiana courts, or legislative history. Given the importance of this issue and the lack of guiding case law, the Court will reconsider its earlier order denying a certificate of appealability. Accordingly, the Court invites either party to make a proper motion to stay trial in this matter and seek interlocutory review of whether duty-risk analysis (and specifically, the foreseeability element of such analysis) is properly applied to claims for damages under § 22:1220, and if so whether the Court has properly concluded that Mr. Khalimsky's stroke and resulting injuries were not foreseeable injuries in this case.

### III. CONCLUSION

Considering the foregoing, the Court rules as follows:

(1) Defendant's Motion for Reconsideration on Mental Anguish Damages is **DENIED**;

(2) Plaintiffs' Motion for Reconsideration on Loss of Use and Damage Caused in Part by Flood is **DENIED**; and

(3) Plaintiffs' Motion for Reconsideration on Medical Expenses and Lost Wages is **DENIED**. The Court will consider a proper motion to stay and seek immediate review of its summary judgment ruling as to lost wages and medical expenses.

New Orleans, Louisiana, this 2nd day of June, 2009.

**KURT D. ENGELHARDT**
**United States District Judge**